GIBSON HOWARD and MARIA' LOUISE RANDALL, Respondents,
*v.* THE CITY OF BUFFALO and Others, Appellants.

Fourth Department, May 1, 1912.

Water and watercourses — interference by railroad companies with
ordinary flood waters by construction of bridge — liability for flood-
ing lands — liability of city for destruction of flood channel —
failure to remove obstructions placed in stream by railroad company
— relief in equity — damages — mandatory injunction — deed con-
strued — section 21 of Railroad Law·construed — measure of damages.

Where railroad companies, after maintaining bridges across a stream for
many years with openings allowing the ordinary flood waters to pass
through their structures without damage to neighboring property,
greatly reduce the capacity of the openings in their crossings, so as to
interfere with the passage of such waters, they are liable for damages
from resulting floods and a mandatory injunction may be granted
directing a restoration of the openings.

Although such bridges were declared to be lawful structures by chapter
201 of the Laws of 1884, such declaration necessarily refers to the man-
ner of their construction at that time. The subsequent closing of the
various openings was negligence and made the bridges a nuisance.

Neighboring owners of land damaged by ordinary floods are entitled to
damages and a mandatory injunction requiring the railroad companies
to provide openings sufficient to carry off the ordinary flood waters.

Where a city after acquiring the rights of a plankroad company across the
flood channel of a river, rebuilt a bridge and so filled up existing sluice-
ways and ditches with solid earth as to materially lessen the flood carry-
ing capacity of the openings, and in rebuilding the road partially
destroyed a natural barrier or flood bank, it is liable for damages caused
by ordinary flood waters and may be compelled to restore the flood
channel to its former condition.

The failure of a city to remove obstructions placed in a river by railroad
companies maintaining a bridge is not such negligence as to make it
liable for the flooding of neighboring premises.

Although a railroad company, maintaining tracks across a creek in such
a manner as to allow the free passage of the water, covenanted in convey-
ances to it to construct and maintain proper ditches, it has no authority
to dam up the creek, close the openings and force the successors of the
grantor to an action for breach of covenant.

A deed described premises conveyed to a railroad company as "Center
line of the railway of the party of the second part, as laid down upon the
map of its railway filed," etc. The map referred to showed in addition
to the location of the railroad a profile of the same giving the eleva-

tions as completed. Such profile showed no openings in a proposed embankment at a watercourse.

*Held,* that the reference to the map in the deed was for the mere purpose of fixing the center line of the proposed railroad, and the profile which was not referred to in the deed did not give the railroad company authority to construct an embankment without openings for the water.

Provisions of a contract for the building of a railroad embankment across a watercourse examined, and *held,* that the obligation of the railroad company under section 21 of the Railroad Law to restore the watercourse to its former state of usefulness was not released by the contract.

The benefits secured by section 21 of the Railroad Law are for the private advantage of the owners of land adjoining a watercourse, and may be granted or conveyed.

The measure of damages for the flooding of lands caused by the erection of unlawful obstructions by railroad companies is the depreciation in the value of the annual use of the lands. Damages cannot be awarded for permanent injuries where the obstructions are to be removed pursuant to a judgment of the court.

KRUSE and FOOTE, JJ., dissented, the former with opinion.

APPEAL by the defendants, The City of Buffalo and others, from a judgment of the Supreme Court in favor of the plaintiffs, entered in the office of the clerk of the county of Erie on the 10th day of October, 1910, upon the decision of the court, rendered after a trial at the Erie Special Term, awarding a mandatory injunction and damages, and also from an order entered in said clerk's office on the 20th day of January, 1908, substituting the present plaintiffs in the place of certain others who were the original plaintiffs in the action.

*Louis L. Babcock,* for the appellants the Delaware, Lackawanna and Western Railroad Company and others.

*Frank Rumsey,* for the appellants the Pennsylvania Railroad Company and the Western New York and Pennsylvania Railway Company.

*William L. Marcy,* for the appellants the Erie Railroad Company and the Buffalo Creek Railroad Company.

*William B. Hoyt,* for the appellant the Lake Shore and Michigan Southern Railway Company.

*James S. Havens,* for the appellant the Buffalo, Rochester and Pittsburg Railway Company.

*George E. Pierce* and *Clark H. Hammond,* for the appellant the City of Buffalo.

*Arthur C. Wade* and *Edward C. Randall,* for the respondents.

Judgment and order affirmed, with costs, upon the opinion of Brown, J., delivered at Special Term.

All concurred, except Kruse, J., who dissented, in an opinion, and Foote, J., who dissented.

The following is the opinion delivered at Special Term:

Brown, J.:

Action by the plaintiffs to recover damages caused by flooding certain lands in the southern part of the city of Buffalo and for an injunction compelling the defendants to remove obstructions in the Buffalo river and certain embankments causing the floods complained of.

Action commenced January 2, 1906; trial commenced January 9, 1907; cause submitted April 23, 1910.

The Buffalo river and the Cazenovia creek have their sources in streams in the western portion of Wyoming county, flow generally westerly across the center of Erie county, uniting at about South Park avenue, in the city of Buffalo; flowing thence in a general northwestern direction to Lake Erie, draining a watershed of about four hundred square miles. From South Park avenue the river takes a very crooked and winding course of six miles to reach the lake, a distance of less than two miles, having a natural fall of about five feet; the water in ordinary stages being from six to ten feet deep and about one hundred and fifty to two hundred feet wide, confined in a channel with generally abrupt banks, four to eight feet above the water level, necessarily a slow and sluggish stream.

With quite persistent regularity this river reaches a highly-flooded condition twice each year, generally once in the fall or winter and once in the spring. These floods have annually occurred since the earliest recollection of living witnesses. Prior to about the year 1888 the flooded area and the bounds of the river in its flooded condition were generally limited and confined by the clearly defined flood banks, marking with cer-

tainty what might be called the flood channel, this flood channel varying from 500 feet to 1,500 feet in width along the course of the river, and, excepting extraordinary rain falls or sudden melting of very deep snow, securely keeping the river flood waters therein. Under conditions then existing, before the acts of the defendants complained of, ordinary floods did not overflow Buffalo river flood banks at Abbott road in the vicinity of Hopkins street, and reach plaintiffs' lands.

At the time the defendants the Lake Shore and Michigan Southern Railway Company, the Buffalo Creek Railroad Company, the Pennsylvania Railroad Company and the New York, Chicago and St. Louis Railroad Company constructed their bridges and approaches thereto across this flood channel, and the Delaware, Lackawanna and Western Railroad Company constructed its lower bridge and the approaches thereto across the same, openings were left in all their approaches to their said bridges, which resulted in allowing such river flood waters to flow down through the flood channel and escape to the lake without reaching plaintiffs' lands. These openings were maintained by the defendant the Lake Shore and Michigan Southern Railway Company from 1852 to 1888; by the defendant the Buffalo Creek Railroad Company from 1872 to September, 1886; by the defendants the Pennsylvania Railroad Company and the New York, Chicago and St. Louis Railroad Company from 1882 to 1892. Since the construction of such crossings over the Buffalo river flood channel, and within twenty years prior to the commencement of this action, all the last-named defendant railroad companies filled in all such openings with solid earth embankments, leaving no means for such flood waters to pass down such channel, except as were afforded by the channels under their respective bridges; and at about the same time all the said defendant railroad companies filled in all openings under their railroad tracks to the west of lands north of Tifft street for a long distance southerly from the Buffalo river. The defendant the Delaware, Lackawanna and Western Railroad Company, in about the year 1891, constructed a long earth embankment westerly from the point of the overflow of the Buffalo river in times of flood at Abbott street to its junction with the Buffalo Creek Railroad Company south of the Buffalo

river. About the year 1895 the defendant the Buffalo Creek
Railroad Company unloaded several carloads of heavy iron
slag from its bridge into the river channel under said bridge;
and in 1897 the defendant the Delaware, Lackawanna and
Western Railroad Company dumped several carloads of stone
into the river channel from its lower bridge. Since such open-
ings in said approaches to said defendants' bridges and the
openings under the railroad tracks to the west of lands north
of Tifft street were closed, such obstructions placed in the river
channel, and the embankment of the Delaware, Lackawanna
and Western Railroad Company was erected, at times of ordi-
nary flood the waters in the Buffalo river have risen to such
a height as to flow over the south bounds of the flood channel
at Abbott road in the vicinity of Hopkins street, running thence
southerly and westerly across lands north of Tifft street, unable
to return to the river or escape to the lake by reason of the
embankments of said defendant railroads, finally reaching
plaintiffs' lands, causing the damage complained of. Such
flood waters so flowing over the south bounds of the flood
channel of the Buffalo river at Abbott road in the vicinity of
Hopkins street were of the following depths on Abbott road:
December 16, 1893, 1.45 feet; May 20, 1894, 2.05 feet; March
20, 1896, 1.65 feet; January 13, 1898, 1.20 feet; January 13,
1900, .58 feet; February 9, 1900, 2.12 feet; December 14, 1901,
.95 feet; April 22, 1901, 1.12 feet; March 1, 1902, 3.05 feet;
January 29-30, 1903, 1.12 feet; February 7-8, 1904, 3.15 feet;
March 3, 1904, .80 feet; March 19, 1905, 2.25 feet; December
6, 1906, .42 feet; February 15, 1908, 1.70 feet; February 24,
1909, .28 feet. Abbott road at the point of overflow is about
10 feet above mean lake level.

It seems to be conceded by all parties that at the time when
flood waters are escaping from the channel of the Buffalo river
at Abbott road in the vicinity of Hopkins street in quantities
sufficient to reach plaintiffs' lands the entire flood waters in the
channel are equivalent to a discharge of about 25,000 cubic feet
per second down the channel. It is established by satisfactory
evidence that the waters have a mean velocity of 4½ feet per
second from a point just above the Lackawanna bridge to just
below the Lake Shore bridge. Dividing the quantity of the

discharge per second by the velocity per second establishes the size of the cross-sectional area through which the quantity to be discharged will flow in a second. From this data it is seen that a cross-section of the flood waters would measure about 5,555 square feet, which would indicate the necessary minimum cross-sectional area of the space for the waters under each bridge; that any bridge affording a less area or cross-sectional space would not permit the passage of such waters without obstruction, unless a greater speed of current was created. With the flood water flowing over the south bank of the flood channel at Abbott road, in the vicinity of Hopkins street, in sufficient quantities to injure plaintiffs' premises the sectional area of the space actually occupied by the waters under defendants' bridges is as follows, as ascertained from the flood of 1904:

Lake Shore and Michigan Southern Railway Company bridge, with water at 6.85 feet above mean water level, 4,470 square feet; the Pennsylvania Railroad Company and the New York, Chicago and St. Louis Railroad Company bridge, with water at 7.06 feet above mean water level, 3,862 square feet; the Buffalo Creek Railroad Company bridge, with water at 7.06 feet above mean water level, 3,805 square feet; the Abbott road bridge, with water at 9.01 feet above mean water level, 3,216 square feet; the lower Delaware, Lackawanna and Western Railroad Company bridge, with water at 8.08 feet above mean water level, 3,780 square feet.

A very careful and exhaustive comparison of all the testimony touching the capacity of these bridge openings justifies the acceptance of the foregoing figures as correct and reliable.

There is no answer to the proposition that it is impossible to get water requiring a channel measuring 5,555 square feet on a cross-section to pass through bridge openings having a capacity as above indicated without causing a large part of the water upstream from such openings being imprisoned and held back unless the current is increased to a degree not to be attained in this tortuous, winding river, with only a fall of about five feet in about as many miles.

There is testimony to the effect that the discharge of 25,000 cubic feet per second is moving at the rate of 6½ feet per second, indicating that a bridge opening of 3,846 square feet

sectional area affords sufficient capacity to accommodate all of such flood waters; from which data it would appear that all the bridge openings, as above measured, were of sufficient size, and that the approaches, abutments and piers do not in fact obstruct the flow of the flood waters. Such testimony is not satisfactory. The testimony to the effect that when the river is in its normal, ordinary, bank-full condition it occupies a space measured on a cross-section of 10,600 square feet area, and is moving at the rate of 4½ feet per second, might be accepted as reliable; but to adopt the arbitrary mathematical measurement of the flood waters filling a 25,000 square feet sectional area as moving 6½ feet per second as conclusive, in view of actual facts, is too untrustworthy as a foundation upon which to dispose of the issues presented by this evidence. The velocity of 6½ feet per second was ascertained by timing the passage of floats through a known distance on the surface of the water, computing the supposed difference in speed of the water at the bed of the river and reaching a conclusion as to the velocity of the whole body of water moving downstream, like measurements and computations made at various places along the six-mile course of the river, and an average or mean velocity ascertained, resulting in the claim that the entire body of flood waters measuring 25,000 square feet on a cross-section moves downstream at the rate of 6½ feet a second.

With such flood waters moving at the rate of 6½ feet a second there would pass through the Lake Shore bridge opening of 4,470 square feet in one second 29,055 cubic feet of water. The fact is that 25,000 cubic feet of water does not pass through this opening in one second; the fact is that the water in times of flood, reaching plaintiffs' lands from a place on Abbott road, in the vicinity of Hopkins street, is five inches higher on the upstream side of the bridge than it is on the lower side at a time when the flood measures 25,000 square feet in sectional area.

With flood waters moving at the rate of 6½ feet a second there would pass through the Pennsylvania Railroad and the New York, Chicago and St. Louis Railroad bridge opening of 3,862 square feet in one second 25,103 cubic feet of water; the fact is that 25,000 cubic feet of water does not pass through the

opening in one second; the fact is that the water in times of flood reaching plaintiffs' lands from a place on Abbott road, in the vicinity of Hopkins street, on the upper side of the bridge, is nine inches higher than on the lower side.

With flood waters moving at the rate of 6½ feet a second there would pass through the Buffalo Creek bridge opening of 3,805 square feet in one second 24,732 cubic feet of water; the fact is that that quantity of water does not pass through such opening in one second; the fact is that the water in times of flood reaching plaintiffs' lands from a place on Abbott road, in the vicinity of Hopkins street, on the upstream side of this bridge, is more than one foot higher than it is on the lower side.

With flood water moving at the rate of 6½ feet a second there would pass through the lower Lackawanna bridge opening of 3,780 square feet in one second 24,570 cubic feet of water; the fact is that that quantity of water does not pass through such opening in one second; the fact is that in times of flood reaching plaintiffs' lands from a place on Abbott road, in the vicinity of Hopkins street, the water on the upstream side of the bridge is more than one foot higher than it is on the lower side.

With flood waters moving at the rate of 6½ feet a second there would pass through the upper Lackawanna bridge opening of 4,209 square feet in one second 27,358 cubic feet of water; the fact is that 25,000 cubic feet of water does not pass through such opening in one second; the fact is that in times of flood reaching plaintiffs' lands from overflow at Abbott road at this bridge the water on the upstream side of the bridge is twelve to eighteen inches higher than on its lower or downstream side.

While it may be true that a part of the flood waters are moving through the bridge openings at the rate of six and one-half feet a second, yet it is also true that a large part of such waters are not moving at anywhere near that rate. If all of such flood waters were so moving there would be no overflow of the flood channel of the river; there would be no appreciable difference between the height of water above and below such bridges. In whatever way the situation is examined the con-

clusion is irresistible that none of these bridge openings, as left after the approaches, sluices and ditches were filled up and stone, etc., dumped into the bridge openings, are of sufficient capacity to take care of the ordinary flood waters that were occasionally to be expected.

The fact is that the water does not go through the bridge openings; it in fact is set back and raised above these bridges; it in fact is higher above each bridge than immediately below; it in fact is higher above each railroad crossing than it would have been if the openings originally in the approaches had not been filled up. It in fact is higher above the upper Lackawanna bridge, where it flows over the Abbott road, than it would be if the said abutments, approaches, piers and obstructions were not within its channel; it in fact does flow over the channel of the river at Abbott road, in the vicinity of Hopkins street, the lowest point in the river bank, and reaches plaintiffs' land, causing the damage complained of. The weight of evidence is that a channel formerly sufficient to discharge 25,000 cubic feet of water a second without injury to plaintiffs' premises has been filled in and obstructed by the approaches, abutments and piers of these bridges and stone, etc., placed therein to such an extent that the full efficiency of the watercourse has been destroyed. The cause of the periodical flow of water over the south banks of the flood channel at Abbott road, and the consequent flooding of plaintiffs' premises, is thus very readily accounted for. Instances could be vastly multiplied and particularized from the more than 4,000 pages of testimony placing the cause of the floods that have flowed across Abbott road upon plaintiffs' lands upon the defendants' failure to observe the imperative necessity of crossing the flood channel in such a manner as to leave sufficient openings for the passage of ordinary flood waters. Such necessity was observed by these defendants when they originally constructed their various crossings, and they were maintained for many years with a view of allowing the ordinary flood waters to pass through their structures without injury and damage to the property of the plaintiffs and thousands of others owning and occupying lands annually flooded since about 1890. Since about that date the defendants greatly reduced the capacity of the openings in

their crossings in violation of their obligation to see to it that they did not interfere with the free passage of all water which it might reasonably be anticipated would flow into and down the river in times of ordinary flood. The failure of the defendants to observe this requirement of law was negligence and rendered them liable for the consequences thereof.

The defendant the City of Buffalo, acting under the provisions of chapter 527 of the Laws of 1906, has undertaken and is now actively engaged in the improvement of the Buffalo river by deepening and widening the channel, necessarily resulting in the removal of the railroad and highway bridges that now span the river, and whatever part these bridges, abutments and piers have played in preventing and obstructing the flow of flood waters is in process of elimination. The plan of the proposed river improvement now being executed involves the deepening and widening of the stream from Hamburg street upstream to a point above the junction of the river and Cazenovia creek. Work is at present in actual progress under contract with the city requiring the dredging of the river to a depth of 20 feet below mean water level up to the Abbott road bridge, and the widening of the channel to 220 feet, exclusive of all piers. Such improvement is a vast undertaking, and is said by competent engineers to be adequate to furnish capacity for all ordinary floods and to prevent future flooding of the plaintiffs' lands from the overflowing of Buffalo river at Abbott road. The improvement at the Lake Shore and Michigan Southern Railway Company bridge will result in a cross-section of about 4,400 square feet below mean water level, and 6.85 feet above that level, reached by the flood of 1904, in a cross-sectional area of 5,907 square feet, thus affording at this bridge apparently ample capacity. The same improvement at all other bridges on the river will restore to the channel at those points all the efficiency destroyed by the filling of the approaches, etc., to the bridges by the defendant railroads, and remove the cause of the damage to plaintiffs' lands. None of the railroad defendants offered any testimony relative to their co-operation with the city in this large improvement. It is apparent that unless the defendants remove their embankments, abutments and piers in the river below the

Bailey avenue bridge there will be no relief to the plaintiffs' lands as a result of the improvements in the river.

While it is true that by chapter 201 of the Laws of 1884 the defendants' bridges were then declared to be lawful structures, such declaration must necessarily refer to the manner of their construction at that time, if in any particular that statute applies to the size or capacity of the opening for the passage of water. At the time the statute was passed the defendant railroad had many openings in the approaches to such bridges and the flood channel was not seriously obstructed. The closing of these various openings was negligence and has made such bridges, their approaches, abutments and piers serious obstructions in the river; has made the bridges unlawful structures and a nuisance. The periodical flooding of the plaintiffs' lands by the overflow of the Buffalo river at Abbott road, caused by the defendants' unlawful structures, is a nuisance causing irreparable damage for which plaintiffs have no adequate remedy at law. The abutments and piers of the bridges of the Lake Shore and Michigan Southern Railway Company, the Buffalo Creek Railroad Company, the Pennsylvania Railroad Company, the New York, Chicago and St. Louis Railroad Company have been in place as now located for more than twenty years, and such railroad companies may have as against the plaintiffs secured the right by prescription to maintain the same as now constructed. The acts of these defendants, however, in filling in the openings to the approaches to their bridges and dumping stone, etc., into the river were committed within twenty years prior to the commencement of this action.

The plaintiffs are entitled to a mandatory injunction requiring these defendants to remove the embankments constituting the approaches to their bridges, and to provide openings in such embankments which, with the openings under their bridges, shall be of sufficient capacity to permit twenty-five thousand cubic feet of water, flowing at a speed of four and one-half feet per second, to flow under their railroad tracks crossing the Buffalo river without being obstructed when the water at the upper Lackawanna bridge is nine feet above city datum.

More than forty years ago the Abbotts Corners Plank Road Company constructed the highway crossing of the Abbott road

through the flood channel of the Buffalo river. A bridge was erected upon the same abutments that now exist and ever since have been used as a foundation for the Abbott road bridge.

In 1890 the defendant the City of Buffalo acquired the rights of the plank road company. At that time there existed three sluiceways across the Abbott road between Hopkins street and the Abbott road bridge of sufficient size to accommodate substantially all the water that could not flow down the channel under the Abbott road bridge; and upon each side of the Abbott road bridge, in the same vicinity, there were ditches running to the river. In times of ordinary floods, prior to 1890, the flood waters in the flood channel of the Buffalo river passed down through these sluiceways, ditches and bridge openings and did not reach plaintiffs' lands. After the defendant the City of Buffalo took over such Abbott road highway it rebuilt Abbott road bridge, using without change the abutments then existing, filled up the sluiceways and ditches with solid earth and paved Abbott road. By such act the city of Buffalo materially lessened the flood-carrying capacity of the openings through or under Abbott road in its crossing of the Buffalo river flood channel and contributed to the raising of flood water in the river at Abbott road in the vicinity of Hopkins street sufficient to cause the overflow at that point and the injury to plaintiffs' lands. These sluiceways and ditches were originally placed in Abbott road highway for the purpose of taking care of the water naturally flowing down the channel, and to close them all up tight and make no provision for this lost efficiency of the channel for flood-carrying purposes was of such gross carelessness and in such disregard of the plaintiffs' rights as to constitute negligence; it was the creation of a nuisance, and for damages legitimately attributable thereto the municipality is liable. By closing these necessary openings under or through its highway the municipality thereby forced upon the Abbott road bridge opening a far larger burden than it was capable of carrying, and because of the insufficient carrying capacity of this bridge opening it then became, ever since has been and now is, a nuisance, and it is negligence for the city of Buffalo to longer continue its dangerous condition.

At the time the city of Buffalo filled in such sluiceways and ditches it also lowered the grade of Abbott road in the vicinity of Hopkins street about one foot. Prior to the lowering of such grade the Abbott roadbed at this place served in a substantial manner to retain the flood waters of Buffalo river in the flood channel at the time of ordinary floods, and by reason of such facts such flood waters did not reach plaintiffs' premises. The lowering of such grade partially destroyed a natural barrier that had existed for more than fifty years, which had in many ways preserved the natural efficiency of the flood channel to accommodate the ordinary flood waters; the partial destruction of this natural barrier or flood bank was a most careless and negligent act on the part of the city of Buffalo; the result of such act was clearly apparent and a violation of plaintiffs' right to have such flood channel bank preserved as a protection from the flood waters which always threatened to overflow the Abbott roadway at that point in times of ordinary flood.

The city of Buffalo having negligently contributed to the cause of plaintiffs' injury must respond in damages for the injuries it has occasioned, and be subjected to an injunction decree commanding the restoration of the flood channel of the Buffalo river at Abbott road between Triangle street and Lee street to the same condition that existed immediately before said defendant filled up the sluiceways under, and the ditches on the sides of Abbott road and lowered the grade of said road.

While it is true that the defendant the City of Buffalo, though its common council has committed itself to a plan of deepening and widening the river for a considerable distance upstream from Hamburg street, and such work is in actual progress from Hamburg street to the Abbott road bridge, yet the fact is that the subject of enlarging the channel of the river at Abbott road rests solely on supposition. So far as the evidence upon this trial reveals, the city of Buffalo is under no contractual obligation to do any effective work that will afford practical relief from these floods on any part of the river upstream from a point just below Abbott road bridge. Of all the obstructions to the flow of flood waters down the flood channel of the Buffalo river, none is more effective than this Abbott

road bridge. The flood waters when at the height of ordinary floods at Abbott road require an area, measured by a cross-section, of 5,555 square feet; Abbott road bridge with water at nine feet above mean water level, which is a flood sufficient to flow over to plaintiffs' lands, has a water space under of only 3,216 square feet. While it may be true that the city of Buffalo does intend to carry out its proved plan of improving the river at Abbott road and above, yet for the purpose of affording relief to the plaintiffs the court cannot assume that such improvement will in fact be made. There can be no relief to the plaintiffs from the unlawful acts of the city of Buffalo in obstructing the flow of water in the Buffalo river flood channel unless these obstructions are removed and the channel restored to its former condition. To give any credence to the city's announced intention of removing its obstructions without providing that such obstructions be removed, in fact would be fruitless and ineffectual.

It very satisfactorily appears that the damages occasioned plaintiffs' premises from flood waters of the Buffalo river and Cazenovia creek must be limited to injuries sustained by water overflowing the south flood channel bank of the river at Abbott road in the vicinity of Hopkins street. While it is true that the openings in the city highway bridges at Bailey avenue, South Park avenue, Stevenson street, Cazenovia street, Seneca street and South Ogden street are far too small and utterly fail to furnish sufficient capacity for ordinary floods, and these bridges and their approaches do obstruct the flow of water in time of ordinary floods and cause much damage to property in their immediate vicinity, yet the plaintiffs are not entitled to any relief therefrom, for the reason that they do not cause plaintiffs any damage, for they do not contribute to any flood in the river at Abbott road in the vicinity of Hopkins street that reaches plaintiffs' lands. It is only on very rare occasions that any flood waters from Cazenovia creek or the Buffalo river above Abbott road near Hopkins street reach the plaintiffs' premises. For the past forty years only three or four such floods have occurred; they were caused by prolonged, heavy rains, sudden melting of exceptionally heavy snow or by the sudden movements of very thick ice causing ice jams. The

city bridge openings were inadequate to carry such floods and resulted in the flood waters being set back and raised to a sufficient height to flow southwesterly across Abbott road east of Bailey avenue, and thence to plaintiffs' lands. Such rare conditions could not reasonably have been anticipated, and the municipality was not guilty of any negligence in constructing such bridges and approaches that contributed to plaintiffs, injury.

The complaint contains no allegation charging the defendant City of Buffalo with negligence with reference to the overflow of South Park lake, nor with reference to its failure to remove the obstructions in the river placed there by the remaining defendants. Whatever testimony was received with reference to the overflow of South Park lake must be stricken from the record as inadmissible under the pleadings. Whatever there may be to the claim for damage caused by the overflowing of South Park lake it is of no importance for the reason that the waters therefrom are so slight in amount that they in no way cause or contribute to any damage to plaintiffs' lands.

The failure of the city of Buffalo to cause obstructions placed in the river by the remaining defendants to be removed might possibly make the city liable for damages caused by such obstructions while the river was being used for navigation purposes; but the damage caused plaintiffs in no manner arises from such a use. The failure on the part of the city to remove such obstructions so placed by the other defendants is not such negligence as to make it liable for the flooding of plaintiffs' premises. The affirmative act of the city in closing the openings under Abbott road and closing the ditches on each side of Abbott road between Hopkins street and Abbott road bridge, thus greatly impairing the flood-carrying capacity of the river channel, is of a far different character and constitutes such negligence as renders the city liable to plaintiffs.

The evidence does not reveal any act of the defendant the Delaware, Lackawanna and Western Railroad Company with reference to its crossing of the flood channel at its lower bridge, within twenty years, that has contributed to plaintiffs' damage, except the filling up of the channel under its bridge with stone. A mandatory injunction is granted the plaintiffs requir-

ing this defendant to remove all such stone from the river channel and restore the same to its former condition. An injunction has been awarded the city of Buffalo compelling this defendant to replace this bridge with one of the swing or draw type, so placed as to conform to the river improvement plans and the necessities of navigation, and all damage to plaintiffs by reason of present conditions at this railroad crossing will be eliminated.

The defendant the Delaware, Lackawanna and Western Railroad Company originally crossed the Buffalo river flood channel at its upper bridge upon an open trestle about one-fourth of a mile long, approaching the bridge from the east; this trestle carried the railroad tracks over this territory from about Prenatt street to the bridge; the natural surface of the land for all this distance being very low, having a very slight elevation above the ordinary banks of the river and in time of ordinary floods being fully covered and forming a part of the flood channel; in times of ordinary floods the flood waters were about one-fourth of a mile wide directly under the railroad tracks, but freely passing down the channel through such trestle without damage to plaintiffs' lands. In 1891 the defendant Delaware, Lackawanna and Western Railroad Company filled in this open trestle with solid earth embankment from the eastern bank of the flood channel of the Buffalo river up to the east end of its upper bridge, leaving no openings therein of any character and completely damming up the entire flood channel, except such opening as was provided under its bridge. In about 1895 the defendant Delaware, Lackawanna and Western Railroad Company unloaded several carloads of stone from this bridge into the river channel under the bridge, materially decreasing the efficiency of the flood-carrying capacity of the opening under its bridge. This bridge opening has a cross-sectional area below the surface of the water, when the water stands 4.30 feet above city datum, of 2,622 square feet. With water standing 4.30 feet above city datum the Buffalo river is in a practically bank-full condition. It is beyond dispute that the space occupied by the water just above the Lacka-wanna bridge, at a time when it overflows the south flood channel bank at Abbott road in the vicinity of Hopkins street

Fourth Department, May, 1912,                    [Vol. 151.

in quantities sufficient to reach plaintiffs' lands, measures at least 5,555 square feet on a cross-section. With water standing at an elevation of 10.25 feet above city datum, at times of ordinary flood, at the upper Lackawanna bridge the opening under the bridge actually occupied by water measures on a cross-section 4,209 square feet.

It is apparent that the opening provided by the defendant Delaware, Lackawanna and Western Railroad Company at its upper bridge for the passage of flood water down the flood channel is not much more than half large enough to accommodate the water that might ordinarily be expected. The filling in of the long trestle across that lowland and the dumping of stone into the channel under the bridge, leaving such a meager opening under this upper bridge, is an obstruction to the waters in Buffalo river; such filling in and the erection of the tight embankment has made the bridge, the abutments and piers unlawful structures; the method adopted by the defendant Delaware, Lackawanna and Western Railroad Company at its upper bridge to take care of ordinary flood waters is a nuisance deliberately created in violation of plaintiffs' rights; contributes with the acts of the other defendants to the plaintiffs' injury and damage, and constitutes negligence on its part for which this defendant is liable to the plaintiffs. The lay of the land is such that the removal of this obstructing embankment from Prenatt street to the east end of the bridge would permit all flood waters that ordinarily might be expected to flow down the Buffalo river flood channel to find ample accommodation to pass under the Delaware, Lackawanna and Western Railroad Company tracks at its upper bridge, without regard to the question of whether the river is dredged and deepened between the upper Lackawanna bridge and the Abbott road bridge. A space of 4,400 square feet, sectional area, below mean water level under this upper bridge would provide a cross-sectional area of something like 6,500 square feet, with water at 10 feet above city datum. It is unknown whether the Buffalo river will ever be deepened and widened upstream from the Abbott road bridge to the upper Lackawanna bridge; the court has no power to compel such work; the court has no power at this time to compel

the Delaware, Lackawanna and Western Railroad Company to reconstruct its upper bridge opening in conformity to some supposed plan of deepening and widening the river by the city of Buffalo. Ample power, however, is possessed to compel this defendant to restore the flood channel of the Buffalo river to its former state of usefulness by removing the obstructions placed therein, which have in a measure destroyed its efficiency for flood-carrying purposes, and contributed to plaintiffs' damages.

A mandatory injunction is hereby granted directing the Delaware, Lackawanna and Western Railroad Company to remove its earth embankments from the east end of its upper bridge to the south side of Prenatt street, to remove the stone placed in the river under its bridge and to restore the flood channel of the river between these points to its former condition before such embankment was placed in such channel.

It is very evident that the Buffalo river cannot be improved, widened and deepened for navigation and flood abatement purposes unless these bridges and railroad crossings over the river be reconstructed — bridges of a swing or draw type substituted — and the channel under such bridges made at least 220 feet wide and 20 feet deep below mean water level. Such reconstruction of all railroad and highway bridges and crossings below Bailey avenue bridge down to and including the Lake Shore bridge would eliminate all causes of plaintiffs' damage due to the negligent acts of the defendants in obstructing the flood channel of the Buffalo river. It is quite likely that all such defendants will comply with the requirements of the river improvement plan relative to their bridges and crossings.

The mandatory injunction to which plaintiffs are entitled, and which is hereby awarded them, requiring the Lake Shore and Michigan Southern Railway Company, the Buffalo Creek Railroad Company, the Pennsylvania Railroad Company and the New York, Chicago and St. Louis Railroad Company to provide openings in their approaches in the flood channel; and the Delaware, Lackawanna and Western Railroad Company to remove the stone thrown into the river at its lower bridge, will be suspended and withheld until such defendants

refuse to comply with the requirements of the river improvement plans relative to its bridges and manner of crossing such river.

The mandatory injunction against the city of Buffalo requiring the restoration of the Abbott road crossing of the flood channel to its former condition will be suspended and withheld until the city shall have a reasonable time in which to provide by contract or otherwise for the execution of the plan of river improvement from just below the Abbott road bridge upstream at least to the upper Lackawanna bridge.

The mandatory injunction requiring the defendant Delaware, Lackawanna and Western Railroad Company to remove its embankment from Prenatt street to its upper bridge, etc., will be suspended and withheld upon condition that it shall, within a reasonable time, provide an opening under its upper bridge of at least 4,400 square feet, sectional area, exclusive of piers, below mean water level, so constructed as to permit the free passage of all water in or over such area under its railroad tracks, without obstruction.

While it is true that in places the banks of the river have been raised and industrial enterprises have erected buildings and structures within the flood channel, yet in no instance have such structures obstructed the flow of flood waters down the flood channel or contributed to the raising of the flood waters above the flood banks at Abbott road in the vicinity of Hopkins street. At all such places the flood waters have flowed around the structures and have not been set back and contributed to causes that damaged the plaintiffs. The damages to the plaintiffs have been caused solely by the acts of the defendants.

The plaintiffs' lands are situated about one mile south of the Buffalo river and are bounded on the north by Tifft street, on the east by Hopkins street, on the south by Marilla street, and on the west by the railroad tracks and rights of way of the defendants the Buffalo, Rochester and Pittsburg Railroad Company, the South Buffalo Railway Company, the New York, Chicago and St. Louis Railroad Company, the Pennsylvania Railroad Company, the Erie Railroad Company, and the Lake Shore and Michigan Southern Railway Company, consisting of about 150 acres of land. Running through the plaintiffs' lands

is Howard creek, which is a small stream with a well-defined watercourse, having its source a mile or more distant in the higher lands to the east and southeast, and fed by springs along its course, and which, prior to about 1890, flowed westward from plaintiffs' lands through openings under the railroad tracks to the west, finding its way into Lake Erie.

About the year 1890 the defendant the Lake Shore and Michigan Southern Railway Company filled in all the openings under its tracks with solid earth embankments, completely shutting off the water of this Howard creek watercourse from outlet to the lake; the Erie Railroad Company, the Pennsylvania Railroad Company, the New York, Chicago and St. Louis Railroad Company, and the Buffalo, Rochester and Pittsburg Railroad Company filled in the openings under their tracks in the watercourse of Howard creek, leaving certain culverts and placing various sized iron pipes, improperly located and of insufficient size to be of effective service in allowing the water of such watercourse to flow from the plaintiffs' premises, and substantially shutting off the water of Howard creek from the lake, except as such waters found outlet through ditches running northerly on the east of the various railroad embankments to the Buffalo river. About the year 1900 the South Buffalo Railway Company constructed an embankment across the watercourse of Howard creek upon its right of way located just east of and adjoining the rights of way of the railroads to the west of plaintiffs' lands. In such construction the South Buffalo Railway Company completely filled in such watercourse and left no opening in its embankment whatever, except a twenty-four-inch iron pipe so located and constructed as to be of little, if any, service in allowing the water from the plaintiffs' lands to flow away. All the railroads to the west of plaintiffs' lands have attempted to take care of the water naturally flowing through the watercourse of the Howard creek by constructing ditches northerly from such watercourse along the east side of their various embankments to the Buffalo river, but such ditches have proved to be utterly inadequate for such purpose. At a point about half a mile north from the Howard creek watercourse all of such ditches are run on a higher level than a part of plaintiffs' lands. At a time when the water in the

Buffalo river at the Buffalo Creek railroad bridge is at a height of four and twenty-five one-hundredths feet above city datum water flows from the river south through these ditches over the high point in the ditches into the Howard creek watercourse onto the plaintiffs' premises, adding to the water flowing over the river flood channel at Abbott road, and southwesterly onto plaintiffs' premises. All these ditches have been uncared for, allowed to fill up with weeds and rank growth and serve no useful purpose in draining the lands of the plaintiffs. The acts of the defendant railroad companies owning rights of way to the west of plaintiffs' premises in closing up and damming the watercourse were in violation of plaintiffs' rights to have the ordinary outlet and watercourse open and unobstructed. The failure to observe these rights was negligence, and they became liable for the damages accruing therefrom. The various conveyances from plaintiffs' ancestors to the defendant railroad companies afford no justification for the closing up of Howard creek. The fact that each of these conveyances contains a covenant on the part of the grantee to construct and maintain proper ditches of sufficient depth to carry off the water might possibly restrict plaintiffs to an action for breach of these covenants in the event they fail to so construct the ditches. It is quite likely that the damages occasioned by breach of these covenants plaintiffs cannot recover in this action, but it is not for failure to comply with these covenants that plaintiffs seek relief. It is to recover damages for flooding their property by damming up Howard creek, setting back its waters on plaintiffs' lands and retaining those waters, together with the waters flowing thereon in times of flood from the Buffalo river at Abbott road. The compliance with the terms of these covenants might be a defense to this action provided such compliance kept plaintiffs' lands free from the flooded conditions created by defendants' acts; but a failure to comply with such covenants is no answer to the assertion that it was wrong to fill in those embankments in such a manner that all flow of water in ordinary times or in time of ordinary floods was prevented. In 1850 the Lake Shore and Michigan Southern Railway Company originally constructed its road across this Howard creek on

open trestle work and maintained such openings for about forty years. During that time the present Erie Railroad Company, the Pennsylvania Railroad Company, the New York, Chicago and St. Louis Railroad Company and the Buffalo, Rochester and Pittsburg Railroad Company constructed their embankments with proper and sufficient openings for the water of Howard creek and ordinary flood waters coming on plaintiffs' lands from the Buffalo river at Abbott road to pass off to the lake, and such openings were maintained for years. To say that the covenants in these various conveyances to the railroads, made at a time when these openings were maintained and Howard creek waters and ordinary flood waters were passing through them out to the lake, were intended to confer authority to dam up the creek, close the openings and force the owners of the Howard farm to solely have recourse to an action for damages for breach of covenant to make proper ditches for drainage is not warranted by the facts. Proper ditches for drainage do not necessarily mean a ditch large enough to carry a great flood or such an ordinary flood as might likely be expected. It is quite possible that a proper ditch for drainage means simply a ditch of sufficient grade, depth and width to drain the soil from accumulated water therein. The very language of these covenants precludes the idea that it was ever intended by any party to them that the waters of Howard creek in such ordinary floods as might likely be expected were to be taken care of by these ditches. The very fact that such waters were taken care of for forty years after the Lake Shore and Michigan Southern railway was built, by openings under its tracks, and for years after the construction of the other railroads, by like openings, is so repugnant to the idea of authority to close the watercourse that such a construction of the conveyances cannot be maintained. At the time the South Buffalo Railway Company's embankment was built in 1900 the plaintiffs' land was being periodically flooded by reason of the railroads to the west of its right of way having closed the openings under their tracks, and by reason of flood water from Buffalo river at Abbott road, and such fact was well known; it could have been seen by any interested observer. It was very apparent that the alleged ditches north from the

Howard creek to the Buffalo river were inadequate and useless. The South Buffalo Railway Company constructed its railroad upon an embankment along the west side of plaintiffs' land, and placed one opening in it of twenty-four inches diameter, so placed through its embankment as to be utterly inadequate to carry the waters ordinarily expected to flow across its right of way. Such failure to provide sufficient openings was negligence and has contributed to plaintiffs' damages.

It is asserted, however, that the conveyance by the plaintiffs on September 5, 1900, to the South Buffalo Railway Company of the premises now occupied by that defendant expressly granted the right to construct its railroad upon a solid fill or embankment from eight to fifteen feet high, and that by reason of such grant the plaintiffs cannot recover any damages caused by such constructed embankment. The difficulty with such contention is that the grant referred to does not authorize such construction. The deed describes the premises conveyed, using the following words as a part of such description, viz.: "Center line of the railway of the party of the second part, as laid down upon the map of its railway filed in the office of the Clerk of the County of Erie on the 17th day of August, 1900." The map referred to was introduced in evidence and shows, in addition to the location of the railroad, a profile of the same giving the elevations as completed. Because such profile shows no openings in the proposed embankments at the Howard creek watercourse it is argued that the deed of September 5, 1900, is a grant of the privilege of constructing the railroad with a water-tight embankment across such watercourse. The reference to the map in the deed is for the mere purpose of fixing the place of the center line of such proposed railroad as surveyed, to the end that the premises conveyed shall extend eighty-six feet easterly of such line. The profile attached to such map is not referred to in the deed, and the purpose for which reference is made to the map has nothing whatever to do with the profile; the mere fact that the profile is upon the map and that the profile does not show any proposed openings in the elevated embankments did not relieve the South Buffalo Railway Company from its statutory obligations to restore the Howard creek watercourse to its former state of usefulness,

or to such state as not to have unnecessarily impaired the same.

On March 22, 1910, leave was granted defendants to introduce in evidence a contract made by the plaintiffs, the Lackawanna Steel Company and the defendant South Buffalo Railway Company on the 12th day of February, 1910, in and by which the plaintiffs agreed on or before April 1, 1910, to convey to the defendant South Buffalo Railway Company a strip of land on the western edge of their premises sixteen feet wide, extending from the center line of Tifft street southerly to the right of way of the Buffalo, Rochester and Pittsburg railroad and thence southeasterly to Hopkins street. The defendant South Buffalo Railway Company covenanted to construct a ditch along the easterly and northerly side of such strip placed suitable for drainage, and also that it would construct a ditch suitable for drainage on the southerly side of a part of such strip leading from Hopkins street to and into the ditch of the Buffalo, Rochester and Pittsburg railroad, it being stated in such contract that it was intended to construct a railroad switch track located on an earth embankment upon the premises to be conveyed; and it was provided that as the embankment on a portion of said premises would not admit of the construction of ditches on the premises conveyed, the plaintiffs' lands adjoining the premises conveyed, not exceeding four feet in width, might be used for such ditches. The defendant South Buffalo Railway Company agreed in said contract to construct, at its own cost and expense on or before May 1, 1910, a switch, as delineated on a plan attached to such contract, crossing at Tifft street and running southerly upon an earth embankment to within about five hundred feet of Hopkins street, the elevation of such embankment to be as indicated on such plan. From the plan attached to said contract it appears that such embankment is to be from seven to ten feet; nothing appears upon the plans to indicate any openings in the embankment for the passage of water.

It is the contention of the defendants that the plaintiffs by this conveyance have provided for a water-tight embankment, to be constructed across Howard creek watercourse; that all claims for future damages by reason of obstructing such water-

course have been destroyed and the plaintiffs' right to injunctive relief to compel the defendants to restore the watercourse through their embankments already in existence has been lost. It is very apparent that if the defendants' construction of the contract of February 12, 1910, is to be upheld there will be no necessity for any openings in defendants' embankments to take care of any water flowing from the plaintiffs' lands, for the reason that no water will get through the proposed embankment, and such construction would certainly defeat the plaintiffs' claim for injunctive relief.

Section 11 of the Railroad Law* provides that every railroad corporation which shall build its road across any stream or watercourse shall restore the stream or watercourse to its former state, or to such state as not to have unnecessarily impaired its usefulness. The embankment of the South Buffalo Railway Company, provided for by the contract of February 12, 1910, has not been constructed; it is entirely practicable to place in the bed of Howard creek watercourse three or four thirty-six inch iron pipes, which will provide the needed outlet to Howard creek; the embankment built over such pipes would serve all the purposes contemplated by the contract. The expense of furnishing such pipes will be trifling compared with the injury occasioned by omitting to provide an outlet. It is very apparent that the claim of the defendants that plaintiffs have contracted away their right to have a practical and serviceable outlet for the water of Howard creek watercourse is not based upon a desire of the South Buffalo Railway Company to be relieved from the duty of constructing its proposed embankments so as not to have impaired the usefulness of the Howard creek watercourse as a practical watercourse, but is based upon the desire of the defendants to be relieved from the necessity of reconstructing their ditches from Howard creek to the Buffalo river so as to make them practical for drainage purposes or of opening waterways through their embankments.

While it is true that the contract of February 12, 1910, is silent as to any required openings through the proposed new

---

* Gen. Laws, chap. 39 (Laws of 1890, chap. 565), § 11; now Railroad Law (Consol. Laws, chap. 49; Laws of 1910, chap. 481), § 21.—[REP.

embankment of the South Buffalo Railway Company, yet the mere fact that the plan attached to such contract shows no watercourse openings is not satisfactory evidence that the plaintiffs have agreed that no such openings need be provided; neither is the fact that the contract calls for an earth embankment seven feet high any evidence that the plaintiffs have stipulated that a solid, impermeable water-tight embankment may be constructed through the Howard creek watercourse. While it is true that the benefits secured by section 11 of the Railroad Law are for the private advantage of the plaintiffs and are susceptible of being granted or conveyed away, yet is it true that the obligation of the South Buffalo Railway Company, in constructing the proposed embankment to restore the Howard creek watercourse to its former state of usefulness, has been released by this contract? It is provided that the South Buffalo Railway Company shall construct a ditch on the east side of its newly-acquired right of way four feet wide, suitable for drainage. What possible necessity for such provision could exist if the only practical outlet for such a ditch was to be completely closed by the earth embankment? There is no feasible plan for an outlet to this proposed ditch, except through the new embankment. It is impossible to make a ditch of any specified depth, grade or width that would be suitable for drainage unless the waters accumulating therein will run off or drain into something away from the land to be drained. This ditch is to be about 2,500 feet long, located along the lower and western edge of upwards of 150 acres of plaintiffs' lands, and will receive the surface water of several hundred acres in addition to the natural water of Howard creek. The ditch is designed to drain the Howard farm. The fact that the parties contracted that the ditch must be so constructed as to be suitable for drainage means that it is to be more than a mere excavation with no outlet. It means that the South Buffalo Railway Company must connect it with something whereby the ditch itself can be drained. Before the conclusion can be reached that the plaintiffs have contracted away their rights under the statute it clearly ought to appear from the contract itself that it is provided therein that there shall be no openings through the proposed embankment. All that does appear is that the plan or

map is silent as to any openings, and the embankment is described in the contract as an earth embankment. The plan shows no fences, and yet it could not be successfully maintained that the plaintiffs have relieved the railroad company from its statutory obligation to build and maintain fences. The reasoning is that because plaintiffs have stipulated for an earth embankment it cannot consist of earth filled in over iron pipes; that it cannot consist of an opening bridged for railroad work; that it must consist of nothing but earth. While the contract does specify earth embankment, yet it could not be successfully claimed that the plaintiffs have contracted away their statutory right to have a farm crossing where necessary, simply because the putting of planks across the top of this embankment for such crossing would change the earth embankment to one of earth and plank. A suitable opening through this proposed embankment cannot be dispensed with if the four-foot ditch is to be made suitable for drainage. The necessities for such an opening are so grave, the expense thereof so comparatively trifling the advantages so great, the failure of the contract to specifically provide that no openings are to be made is so apparent, that it is impossible to reach the conclusion that the plaintiffs have forfeited their right to compel the South Buffalo Railway Company to restore the Howard creek watercourse to its former state of usefulness in constructing the proposed embankment.

The plaintiff is entitled to a mandatory injunction requiring the defendants the Lake Shore and Michigan Southern Railway Company, the Erie Railroad Company, the New York, Chicago and St. Louis Railroad Company, the Pennsylvania Railroad Company, the Buffalo, Rochester and Pittsburg Railroad Company and the South Buffalo Railway Company to restore the watercourse of Howard creek to its former condition; to provide and maintain suitable and proper openings of at least forty square feet sectional area in size in their embankments across the watercourse of Howard creek, the bottom thereof to be below one foot above city datum at proper grade, so as to permit all the water in said watercourse at all times to flow from the plaintiffs' premises and pass through such embankments.

Much of the damage to plaintiffs' lands is caused by floods from Buffalo river, due to obstructions therein that are to be removed. Such removal will relieve the necessity for larger openings than above provided for through the railroad embankments to the west of plaintiffs' premises. It is very apparent that if a twenty-four-inch opening through the present embankment of the South Buffalo Railway Company was enlarged to three times its present capacity and lowered eighteen inches, and the ditches from the Howard creek watercourse north to the Buffalo river were cleaned out and deepened so as to permit all the water therein to drain away, and such openings as are now in such railroad embankments cleaned out, lowered and made practical for drainage purposes, and some practical and systematic attention given to their effective maintenance, there would be no necessity for the openings directed to be made by mandatory injunction herein provided for.

For the purpose of affording an opportunity of putting the present openings in the embankments to the west of plaintiffs' premises and the ditches to the Buffalo river in a practical, serviceable condition so as to be suitable for drainage, without the expense of complying with the provisions of the mandatory injunction herein provided for, the issuing of such injunction will be withheld a reasonable time.

About twenty-five acres of plaintiffs' lands have been rendered useless for ten years by the acts of the defendants in obstructing Buffalo river, causing its ordinary flood waters to flow upon plaintiffs' premises and preventing the same from flowing therefrom, and if the obstructions created by the defendants in the Buffalo river and Howard creek watercourse were to be deemed permanent the plaintiff would be entitled to recover in this action the value of the twenty-five acres, about $50,000, together with such additional sum as would be fair compensation for damages occasioned other portions of plaintiffs' lands that have not been rendered entirely useless. The measure of damages, however, is not compensation for permanent injury, for the reason that the damages are not permanent. The obstructions created by the defend-

ants cannot be treated as permanent, for the reason that they are to be removed under and in pursuance of the judgment to be entered hereon.

The correct measure of damages seems to be the depreciation in the value of the annual use of the plaintiffs' premises that has been caused by the acts of the defendants. It is undisputed that the plaintiffs' premises have a fair rental value of $1,000 per annum freed from the flood conditions caused by the defendants' negligent acts; that in its condition, as flooded by the defendants, such rental value is the sum of $450.

While it is true that plaintiffs' lands have been annually flooded for more than six years prior to 1906, the time of the commencement of this action, the damages have been of a more permanent character since 1902; the depreciated rental value, however, being $550 for the past ten years.

The plaintiffs are entitled to recover such depreciated rental value for six years prior to the commencement of this action, and for the four years of the pendency of the same, a period of ten years, viz., the sum of $5,500. The acts causing this damage were not the joint acts of all the defendants. The two defendants, the Pennsylvania Railroad Company and the New York, Chicago and St. Louis Railroad Company, jointly committed the acts relative to the obstructions in the Buffalo river by filling in the openings in the approaches to their joint bridge, and also the acts relative to the filling in of the openings through their joint embankment across the Howard creek watercourse. The acts of the remaining defendants in placing obstructions in the Buffalo river and across the Howard creek watercourse were all committed at different times and places, and were the separate acts of each defendant; each of such defendants thus becomes solely liable for the damages it separately has occasioned. To fix and ascertain the exact amount of damage for which each defendant is liable may be an impossibility; but no more impossible than to exactly determine the total damages inflicted by all the defendants. In view of the character of the obstructions, the acts of the defendants, the relation existing between these acts and the damages occasioned, the plaintiffs are entitled to recover from the defendants the following sums:

The City of Buffalo, the sum of $600; the Lake Shore and Michigan Southern Railway Company, the sum of $1,000; the Pennsylvania Railroad Company and the New York, Chicago and St. Louis Railroad Company, jointly, the sum of $700; the Buffalo Creek Railroad Company, the sum of $500; the Delaware, Lackawanna and Western Railroad Company, the sum of $1,700; the Erie Railroad Company, the sum of $300; the Buffalo, Rochester and Pittsburg Railroad Company, the sum of $300, and the South Buffalo Railway Company, the sum of $400.

Judgment is accordingly ordered, with costs against all the defendants. This being a difficult and extraordinary case, an extra allowance of five per cent is awarded the plaintiffs.

KRUSE, J. (dissenting):

The judgment awarded requires the city of Buffalo and certain of the defendant railroad companies to undo certain things which, as is claimed, turn out of their natural course the flood waters of Buffalo river and Cazenovia creek, and obstruct the waters of Howard creek, casting the waters upon the plaintiffs' premises, known as the Howard farm, situate in the southwestern part of the city, about a mile from Buffalo river and a half mile from Lake Erie. Howard creek (so called) runs westerly across the premises towards the lake. The judgment also awards damages so done in the past.

1. I think the injunctive relief awarded the plaintiffs against the city is unwarranted in law and impracticable, and even if carried out strictly, will not prevent the flood waters from reaching the plaintiffs' land. The judgment requires the city to restore the so-called flood channel of Buffalo river across Abbott road, for a distance of about a mile, to the same condition as before the street was paved in 1892. That means, as I understand it, that the pavement must be taken up, the Lackawanna viaduct removed or rebuilt and the old plankroad grade, with ditches on either side of the roadway and connecting sluices underneath, restored.

If that is done the water will overflow elsewhere, for the natural channel of the river has always been too small to hold the water in flood times, and however serviceable the ditches

may have been in the past, I am satisfied that they would not now hold the flood waters; and the sluices under the roadway would facilitate the flow of water, which is now obstructed by a solid embankment. Besides, the plankroad grade in some places was even lower than the present grade at the lowest point, and if the grade is to be raised to the highest point of the old plankroad grade and as high as the banks down stream below Abbott road, the overflow will be increased at points farther upstream.

That the water will overflow in flood times and reach the plaintiffs' land, although a mile away from Buffalo river, seems reasonably certain. The natural slope is from the river and creek towards the plaintiffs' land, the fall being about one foot in one thousand, and even with the grade as it is now, the Cazenovia creek has overflowed just above its junction with the river and the water run along and to the south of Abbott road. Moreover, the railroad ditches below Abbott road, which connect the plaintiffs' land with the river, are so much lower than the grade of Abbott road that the flood waters, it would seem, would reach their land by that means before they overflowed the Abbott road grade, if the ditches are kept open, as the plaintiffs insist they should be.

But above and beyond these considerations, I think the city had the right to grade and improve the street. It certainly could not be expected that a pavement would be laid upon this irregular and uneven plankroad grade, with ditches on the side and underneath. And unless it was negligent, the city is not liable for the consequences resulting therefrom.

Not only did the city have direct legislative authority for doing what it did, but the Legislature has from time to time made provision for abating the floods (Laws of 1891, chap. 105, § 405, as amd. by Laws of 1900, chap. 571, § 1); and finally declared the condition a nuisance and made it mandatory upon the city to abate the flood conditions (Laws of 1906, chap. 527). The city has adopted a plan for enlarging the channel of the river, has spent hundreds of thousands of dollars in that work and is now actively engaged in carrying forward the work; and it is reasonably certain that within two years' time, perhaps less, the work will have so far progressed as to entirely

prevent the overflow of the flood waters to a point up the river beyond Abbott road.

I think the city should not now be hampered with this injunction. It is true that the injunctive relief is suspended for a reasonable time, to carry out that plan, but Buffalo river is a navigable waterway, is so recognized by both the State and the nation, and just what changes may be made in improving the river cannot now be foreseen. As the situation now is, with the work in progress, the most the plaintiffs can require, as it seems to me, is that the work shall be prosecuted with reasonable diligence. If the plaintiffs have no remedy under that act, I think they have no remedy at all. The Legislature has provided for abating the floods, and the plan adopted is the only effective way yet devised.

2. What has been said regarding the liability of the city applies largely to the liability of the railroad companies. They had the right to construct their railroads over the river and the question is whether they are at fault in the way in which they built the approaches and bridged the river. If not, no liability exists for the resulting consequential damages. (*Bellinger* v. *New York Central Railroad*, 23 N. Y. 42; *Moyer* v. *N. Y. C. & H. R. R. R. Co.*, 88 id. 351; *Gordon* v. *E. & K. R. R. Co.*, 195 id. 137.)

In bridging the river the railroad companies were required to use reasonable care and foresight not to obstruct the channel of the river or unnecessarily interfere with the flow of the waters thereof. Their duty, as it has been expressly declared by statute since 1850, is to restore the stream or watercourse which the railroad intersects or touches to its former state or to such a state as not to have unnecessarily impaired its usefulness. (Laws of 1850, chap. 140, § 28, subd. 5, as amd. by Laws of 1880, chap. 133, and Laws of 1887, chap. 724; Railroad Law [Gen. Laws, chap. 39; Laws of 1890, chap. 565], § 11; now embodied in Railroad Law [Consol. Laws, chap. 49; Laws of 1910, chap. 481], § 21.)

It is contended by the plaintiffs that the channel under the bridges has been obstructed and its carrying capacity lessened, while the railroad defendants contend that although piers and abutments were built to support the bridges, as was necessary,

the flow of the water operating under natural laws immediately re-established what is known as the regimen of the stream, increasing by erosion the channel so that the cross-sectional area is the same as before and as large as immediately above and below the bridges; that in fact the channel has been deepened under every bridge. However that may be, the judgment requires not only the enlargement of the openings under the several bridges, but as well the removal of the embankments and approaches to their several bridges and making openings in the embankments sufficient to permit the flow of a certain volume of waters under certain conditions specified.

Whatever else may be said of the injunctive relief, I think, to remove and open up the solid embankments and approaches to the bridges is unwarranted and would be ineffective to keep the waters from the plaintiffs' land, and for reasons which have already been stated, relating to the injunctive relief awarded against the city. The waters would be blocked by the improvements below and be cast upon or over the lands which are lower. Even if every building and improvement on either side of the river were removed, as far up the river as above the Abbott road, so as to make a flood channel from 500 to 1,500 feet wide, as described in the decision, the flood waters would still find their way to the plaintiffs' lowlands, as has been pointed out.

If there is any liability here at all, it rests upon the doctrine that one may not so use his own as to encroach upon the legal rights of others. The application of that principle must be determined largely by the rules of public policy—what would best conserve public interests as a whole.

A distinction has been made between surface waters and the waters of a natural watercourse, pointing out the difference between the civil law and the common law in that regard (*Barkley* v. *Wilcox,* 86 N. Y. 140); although it has been said by high authority that both rules rest upon substantially the same principles. (*Boyd* v. *Conklin,* 54 Mich. 583.)

According to the findings this stream has three channels or stages of importance, as it is said — low-water channel, bankfull channel and flood channel. The latter is stated to be from 500 to 1,500 feet wide, with well-defined banks. While it may

be true, as the findings indicate, that there are irregular elevations of land at certain points along the course of the stream, it is evident that they are not so connected as to hold the flood waters within these bounds. Usually, the periodical floods have extended in a solid, moving mass, far beyond this so-called flood channel.

I do not think it is the law that the channel of a stream comprehends the entire area covered by a moving mass of flood water, within which the flow must not be interfered with to the detriment of the lands beyond this area. If so, a much larger territory than the flood channel, as here described and defined, must be withdrawn from use and permitted to lie in a state of nature.

Such a rule, rigidly applied, would prevent the upbuilding of the river valleys of the country, in many of which, like the Mississippi, the flood waters have moved along the course of the river in a solid mass, many miles in width; and to a large extent would have prevented the upbuilding of South Buffalo along the river and creek. Many streets besides Abbott road would be affected, which are now built up with residences, manufacturing plants and other improvements. Both sides of the river, from the lake to above Abbott road, have been largely built up and the banks of the river dyked and raised, all of which must be torn down and removed, if this so-called flood channel must be cleared and reduced to its former natural state. That, as it seems to me, is the logical effect of the decision.

I do not say that flood waters moving and connected with the main current of the stream may not, under certain conditions and within certain limitations, be regarded as waters of the stream and the rules of watercourses applied thereto, although outside the ordinary channel of the stream; nor that the owners of lands in making improvements along this stream may not have encroached upon the legal rights of others. But the question now under consideration is whether, in view of the statute authorizing the railroad defendants to construct their railroads, and bridge the stream, they have been at fault in the way that has been done, to the detriment of the plaintiffs, and if so, to what legal redress the plaintiffs are entitled.

I think the plaintiffs are not entitled to the money judgment

which has been awarded to them, for reasons which I will state later; nor to the injunction, the logical effect of which has been pointed out and which, if carried out, would cast the waters upon the lands of others, who are not now parties to this action, and would not, as I think, relieve the plaintiffs premises from the overflow.

3. As regards Howard creek: I have no doubt that originally there was a living stream, having its source in springs about a mile or more from the lake, flowing in a westerly direction over the plaintiffs' premises, the waters eventually finding their way into the lake. But there is not much left of its characteristics as a stream. The depression remains as far as the railroad embankments, but beyond there is little if any indication of a watercouse, and the waters, before reaching the plaintiffs' premises, have been largely intercepted and drained into city sewers, except when there is an overflow in flood times. The only useful purpose which the channel would now serve is that of drainage, and I do not see how that would be effective, except for the railroad ditches. Even before the embankments were built, whatever waters of Howard creek found their way from the lowlands and swamps to a point west of the present railroads, were intercepted by the Tifft farm ditches, which connected with the Buffalo river.

But beyond that, I think that when the plaintiff's predecessors in title conveyed the strips of land to the various railroads for railroad purposes, it was contemplated that the waters of Howard creek should be intercepted and drained into the river by ditches to be constructed by the railroad companies, and that the channel across the rights of way might be closed. The embankments have benefited rather than harmed the plaintiffs' premises, for they have kept off the lake waters which swept through the open culverts from the lake and periodically submerged the plaintiffs' land, with the other lowlands in this vicinity. I think the ditches were intended to take care of the waters of the creek with that of the other drainage.

While the plaintiffs are entitled to redress for the failure upon the part of any of the railroad defendants to fulfill their obligations respecting the ditches, so far as they serve any useful purpose in connection with the lands now owned by the

plaintiffs, I think they are not entitled to a mandatory injunction requiring the railroad companies to open the Howard creek channel under the embankments.

4. As regards the damages: The damages awarded cover the six years before the commencement of the action and the four years thereafter, up to the time of the trial, allowed at the rate of $550 a year, amounting to $5,500. They were apportioned against the several defendants according to the damage done by each, as it is claimed, awarding $600 against the city and amounts ranging from $300 to $1,700 against eight of the defendant railroad companies, besides a proportionate amount of the costs against each of the defendants so held liable, the trial court holding that the defendants were not jointly liable, but each liable only for the damages done by it, following the rule of the *O'Donnell* case (*O'Donnell* v. *City of Syracuse*, 184 N. Y. 1).

The damages awarded seem to be the loss in rental value of the land overflowed from the flood waters, which according to the testimony of one of the witnesses is a depreciation annually of from $500 to $600. But the evidence seems to indicate that if there was any liability at all, the acts of others than those who are made parties to this action caused in part or contributed to the conditions for which the plaintiffs seek to recover damages. If so, it was improper to charge all the damages against these defendants; and even if they were liable, it would not justify making an arbitrary division of the damages among several defendants merely because they were incapable of separation and the proportions of liability could not be established, as was held in the *O'Donnell Case* (*supra*), and besides, the drainage ditches on plaintiffs' land have not had the same care and attention since the death of the former owner as before.

I think the evidence fails to sustain the award of damages, either in gross against all the defendants or the amount apportioned against each of them.

I think the judgment should be reversed and a new trial ordered.